## Estate of Mary Cullen, deceased.    Appeal of Thomas R. Cleary.

*Decedent's estate—Funeral expenses must be moderate and appropriate.*
Only such sums will be allowed for funeral expenses as will bear a just,
fair and reasonable proportion to the amount of the estate of the decedent
and his station in life. Undertakers take the risk of the estate proving
insolvent, in which case, as against creditors, the rule will be strictly en-
forced. Children, legatees, distributees and creditors all will be protected
against exorbitant and rapacious bills for funeral expenses.

Argued Oct. 12, 1898.    Appeal, No. 112, Oct. T., 1898, by
Thomas R. Cleary, from decree of O. C. Phila. Co., Oct. T.,
1897, No. 484, dismissing exceptions to adjudication.    Before
RICE, P. J., ORLADY, SMITH, W. W. PORTER and W. D. POR-
TER, JJ.    Affirmed.

Exceptions to adjudication of ASHMAN, J.

It appears from the evidence that decedent died in 1896;
that John Cullen, a relative, gave to Thomas R. Cleary, an un-
dertaker, an order directing him to give deceased "a first-class
funeral, leaving the cost for the same entirely with him, and
any amount he may ask or charge for his services will be per-
fectly satisfactory to me. (Signed) John Cullen." At Mr.
Cullen's request and by his renunciation, Cleary took out let-
ters of administration and took credit in his account as admin-
istrator for his bill as undertaker for $810.90.

The auditing judge, ASHMAN, J., filed the following adjudi-
cation:

The account of Thomas R. Cleary, administrator, was called
for audit before ASHMAN, J., February 14 and 16, 1898, and
March 18, 1898.

Counsel appeared as follows:

Horace M. Rumsey, Esq., representing Hon. F. CARROLL BREWSTER, for the accountant.

Wm. Gorman, Esq., for John, Joseph and Alice Cullen, brothers and sister of the decedent.

Mary Cullen, as appears by the annexed affidavit of John Cullen, died November 7, 1896, unmarried and without issue, leaving as her sole surviving next of kin under the intestate laws two brothers, John and Joseph, and one sister, Alice Cullen.

At the hearing the auditing judge was asked to decide the question of what constitutes a "first-class funeral," that being the alleged term used in the contract under which the undertaker, who is also the administrator, buried the decedent.

The question happens in this instance to be very sharply defined, because no doubt exists as to the decedent's social status nor as to her pecuniary means. Her position was that of a domestic servant and her fortune consisted of $1,167.36 cash in the saving fund, together with clothing, household furniture and an umbrella which were valued altogether at $3.25. Her funeral cost $810.90. Her surviving sister and brothers complain that this expenditure evinced a want of economy in the administrator, by which their several shares in her estate will be reduced to the meager sum of $41.57 with a further diminution from counsel fees. Several undertakers were called by the accountant as experts to define the qualities of a first-class funeral. Their testimony was even more vague than that which is usually given by experts. One of them divided all funerals into two classes. He said, "there is funerals, and there are funerals," but he did not say whether, in his opinion, this funeral belonged to the first or the second of these divisions. The exceptants, in order to provide materials for the judgment of the experts whom they also produced, opened the grave of the decedent more than a year after the interment and exhumed the coffin; and the casket and its contents, exclusive of the corpse, were duly appraised. The prospect afforded by this proceeding is not reassuring to future decedents. The church, as it did here, may offer up prayers for the repose of their souls, but neither the church nor the state can secure the repose of their bodies when the bill of an undertaker is at stake. In no light

to which the credit claimed in the account for this outlay may be exposed, can it be sustained. To take that which was attempted to be cast upon it by the claimant himself, it appeared that the body was sent to his rooms by the woman at whose house the decedent had died. He had an interview with the decedent's brother, who told him that he was the decedent's sole surviving relative ; that he had not seen his sister for many years ; that he did not believe she had left any money, or at least so much as the undertaker asserted ; and that he did not care to take out letters of administration nor to attend to the funeral. He thereupon renounced in favor of the undertaker his right to letters and he made his mark to a paper drawn up by the accountant requesting the latter to bury the decedent and " to furnish such articles as may be necessary for a first-class funeral, leaving the cost for the same entirely with the undertaker." Undoubtedly the general proposition is true that a man may direct the expenditure of as much of his money as he pleases in celebrating his funeral and that a relative may contribute the whole of his share in an estate towards the burial of his testator or intestate, but he must first know what he is doing. In this instance the brother could neither read nor write and believed that his sister had died poor. His idea of the equipment for a first-class funeral for his deceased sister as shown by a paper which he and his messenger swore was given to the undertaker, but which the latter denied having received, was entirely reasonable, and if adopted would have accorded her a respectable interment.

The undertaker's views were on a larger scale.

For an obscure woman who had lived in a single room in a back street, he provided a casket at $500 and a burial robe at $40.00. Five relatives, in all, attended at the funeral, yet he furnished twelve carriages, six professional pall bearers and an usher, and he charged $10.00 for his personal supervision. There was also a charge of $20.00 for chairs, bouquets and candelabra. If the testimony for the exceptants is reliable every one of these amounts was an overcharge. But the real question is one of good faith. The accountant was administrator, and it was no part of his official business to make money out of his trust. Long before the body was removed from his rooms, he was notified that other relatives besides the brother

existed; so that he was not protected even by the improvident agreement of the brother, if it was ever made. In awarding, as administrator, a contract to himself as undertaker, which involved the funds of the estate, he was bound to see that its terms were at least such as a prudent trustee would, under the circumstances, have expected from a stranger. It is unpleasant to be compelled to make these criticisms, and still more unpleasant to be forced to act upon them; but under the evidence which was submitted the largest allowance which can reasonably be granted for the expenses of the decedent's burial, exclusive of the sum paid for masses, which will stand, is $200, and the balance of the credit, $585.90, must be striken out. Of the many cases which might be cited as apposite, it is sufficient to refer to Hasson's Estate, 5 C. C. Rep. 19, where the balance of the fund was $1,500, and the undertaker's claim, $475.75, was reduced to $150.

Exceptions were filed to the adjudication as follows:

1. The learned auditing judge erred in finding "long before the body was removed from his (the undertaker's) rooms, he was notified that other relatives besides the brother existed."

2. The learned auditing judge erred in not allowing the credit of $810.90 for the funeral expenses of decedent.

3. The learned auditing judge erred in allowing only the sum of $200 for said funeral expenses.

These exceptions were dismissed in the following opinion by HANNA, P. J.

In this case the administrator is the undertaker, who assumed the risk of retaining for his own use the sum of $810.90 out of an estate of $1,167.36, for the expenses of the funeral and interment of the decedent. And his only authority for the expenditure of so large a proportion of the estate is the alleged assent of a brother of decedent that he should take out letters of administration and furnish his sister "a first-class funeral." No thought, apparently, was given to the rights of another brother and sister, who were equally interested. The decedent was a domestic servant at the time of her death, and her estate consisted of her savings deposited from time to time in a saving fund. The room she occupied when not employed was so inconvenient and illy adapted for the purpose that her

funeral took place from the office of the undertaker.   And while the magnificence of the surrounding ceremonies and cost of her interment might well have gratified her vanity, yet we can but think the lavish outlay of expense would have been a severe shock to her notions of thrift and economy.   She certainly never contemplated her remains would repose in a "cedar couch casket, heavily draped, lined with white silk, with raised name plate oxidized, and gold extension bar handles, and silk pillow," at a cost of $500, nor that they would be embalmed at a further expense of $50.00.   Nor that an imposing cortege of twelve carriages would be provided, together with six professional pall bearers, each adorned with a buttonhole bouquet, while the procession of mourning relatives numbered but five persons, but not similarly ornamented.   This was evidently an oversight of the undertaker.

In addition to this we are inclined to believe that amid the many details of this elaborate and munificently arranged ceremony, while the undertaker perhaps intended to inter the remains of the decedent in the cedar couch casket with gold extension bar handles, etc., yet through some inadvertence a casket of a very different and far inferior character was substituted.   Whether from information received or suspicion that so costly a casket had not been used by him and charged for, during the hearing before the auditing judge at the instance of the surviving relatives of the decedent, her grave was opened and her remains exhumed, when it was discovered she had been interred in an ordinary couch casket with satin lining and covered with black cloth.   It was constructed of chestnut or poplar instead of cedar, and with six oxidized silver handles in place of gold extension bar handles.   The entire cost of which, as testified to, would be about the sum of $150.   In view of this testimony, which is uncontradicted except by the undertaker himself, and upon which but little reliance can be placed, we think the claim has been liberally and generously dealt with.   Parties interested in the estates of the dead, whether as widow, children, legatees, distributees or creditors, will be protected against such exorbitant and rapacious, if not fraudulent, bills for funeral expenses as here presented.   And it is time it is clearly understood that only such a sum will be allowed for funeral expenses, cost of cemetery lot, erection of

monument, etc., as will bear a just, fair and reasonable proportion to the amount of the estate of the decedent and his or her station in life. Undertakers should also realize they take the risk of the estate proving insolvent, in which case as against creditors they will be held strictly to the requirements of the rule. In this connection it is only necessary to say that this is no novelty in the procedure in this court and has been enforced in a number of instances: Bradley's Est., 11 Phila. 87, Hirst's Est., 12 W. N. 323, Barclay's Est., 2 W. N. 447, Hasson's Est., 5 C. C. R. 19, Bauman's Est., 19 Phila. 98, and by RHONE, P. J., in Luzerne County in Gorman's Est., 2 Kulp, 61.

As the auditing judge very properly reduced the amount to be allowed for the funeral expenses of decedent to the sum of $200, the exceptions are dismissed and adjudication confirmed.

*Errors assigned* were (1–3) the dismissal of exceptions filed by the administrator, reciting same.

*F. Carroll Brewster*, for appellant.—In the case at bar there was an express contract with Mr. Cleary as undertaker, and when he made the contract he was not an administrator. There was nothing in the bill to excite wonder. No creditor objects. The objection is raised by the man who gave the order.

*William Gorman*, for appellee.

PER CURIAM, November 14, 1898:

We can add nothing profitably to what is contained in the opinions of the auditing judge and the court below in support of this decree.

For the reasons there given the assignments of error are overruled, the decree is affirmed, and the appellant is directed to pay the costs of this appeal.